IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

TERRI KERR,                       §
                                  §
Plaintiff,                        §
                                  §
V.                                §        CIVIL ACTION NO. H-08-1229
                                  §
MICHAEL ASTRUE,                   §
COMMISSIONER OF THE SOCIAL        §
SECURITY ADMINISTRATION,          §
                                  §
Defendant,                        §

## MEMORANDUM AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Before the Magistrate Judge[1] in this social security appeal is Plaintiff's Motion for

Summary Judgment (Document No. 16) and Brief in Support (Document No. 17) and

Defendant's Motion for Summary Judgment (Document 14) and Brief in Support (Document

No. 15). Having considered the motions for summary judgment, the administrative record,

and the applicable law, the Magistrate Judge ORDERS, for the reasons set forth below, that

Plaintiff's Motion for Summary Judgment (Document No. 16) is DENIED, Defendant's

Motion for Summary Judgment (Document No. 14) is GRANTED, and the decision of the

Commissioner is AFFIRMED.

---

[1]The parties consented to proceed before the undersigned Magistrate Judge on July 15,
2008. (Document No. 11)

## I. Introduction

Plaintiff Terri Kerr ("Kerr") brings this action pursuant to Section 205(g) of the Social Security Act ("Act"), 42 U.S.C. § 405(g) (2009), seeking judicial review of a final decision of the Commissioner of Social Security Administration Commissioner ("Commissioner") denying her applications for supplemental security income ("SSI") and disability insurance ("DI") benefits. Kerr argues that substantial evidence does not support the Administrative Law Judge's ("ALJ") decision, and that the ALJ, Richard L. Abrams, committed errors of law when he found that Kerr retained the residual functional capacity ("RFC") for a restricted range of light work. In particular, the ALJ made the following RFC determination:

> [Kerr] has the residual functional capacity to lift and or carry and push and or pull 20 pounds occasionally and 10 pounds frequently, stand and or walk about 6 hours in an 8-hour workday, and sit about 6 hours in an 8-hour workday. Furthermore, the claimant is limited to simple, routine work with one or two step instructions in a low stress environment, limited interaction with the public or co-workers, and avoidance of hazards such as heights, vibration, and dangerous machinery.

The ALJ further found that while Kerr could not perform her past relevant work, he did find that she could perform such work as an office cleaner, a laundry worker, and a small products assembler, and that she was therefore, not disabled. Kerr contends that the ALJ failed to apply the appropriate legal standards and that substantial evidence does not support the ALJ's decision. According to Kerr, the ALJ erred in several respects, first, by violating SSR 00-4p by failing to resolve the conflict between the Vocational Expert ("VE") testimony and the DOT. Kerr contends that because the ALJ found she could perform a limited range of light

work, the jobs identified by the VE should have been at that level. Instead, two of the three jobs the VE listed as matching her RFC required a higher exertion level or skill level (Tr. 997). Kerr next argues that the ALJ erred by improperly evaluating her subjective physical complaints. According to Kerr, because the ALJ gave controlling weight to the opinions of the State agency medical consultants who performed their examinations in 2003, and not on subsequent medical examinations, the ALJ did not base his decision on substantial evidence. Finally, Kerr argues that the ALJ erred by improperly evaluating her psychiatric impairments. According to Kerr, because the ALJ relied only on the opinion of Dr. Glen Sternes, a ME, and because Dr. Sternes' testimony does not sufficiently combine analysis of both the psychological and the physical impairments, the ALJ did not base his decision on substantial evidence. Kerr moves the Court for an order reversing the Commissioner's decision and awarding benefits. The Commissioner responds that there is substantial evidence in the record to support the ALJ's decision, that Kerr was not disabled as a result of her impairments, the decision comports with applicable law, and that it should therefore be affirmed.

## II. Administrative Proceedings

Kerr applied for SSI benefits on May 12, 2003, and DID on May 22, 2003 claiming that she has been unable to work since March 20, 2002 due to chronic pain syndrome, pain in the right arm, neck, and back, fibromyalgia, obesity, hypertension, diabetes, bipolar disorder, borderline personality disorder and post traumatic stress disorder (PTSD). The

Social Security Administration denied her applications at the initial and reconsideration stages (Tr. 56-69). After that, Kerr requested a hearing before an ALJ (Tr. 70). The Social Security Administration granted her request (Tr. 71-75) and the ALJ held a hearing on January 13, 2005 (Tr. 97), at which Kerr's claims were considered *de novo*. On July 15, 2005, the ALJ issued his decision finding Kerr not disabled (Tr. 105-116). The ALJ found, at step one, that Kerr had not engaged in substantial gainful activity since her alleged onset date. At step two, the ALJ found that Kerr has diabetes mellitus, hypertension, degenerative joint disease of the shoulder, bipolar disorder, and borderline personality disorder. At step three, the ALJ found that these impairment(s) do not meet or equal the requirements of a listed impairment. At step four, the ALJ concluded "that the testimony adduced at the hearing [was] not wholly credible or supported by the evidence as a whole insofar as the claimant alleges an inability to perform all work activity including at least a limited range of light work..." The ALJ further concluded that based Kerr's RFC, she is "capable of engaging in light work. The claimant is unable to do any crawling, balancing, or climbing of scaffolding or ladders. The claimant must avoid hazards such as heights, vibrations and dangerous machinery. The claimant can do only limited twisting, stooping, crouching kneeling and climbing of stairs or ramps. The claimant must be allowed the option of sitting or standing. The claimant must work in a low stress environment. The claimant is capable of maintaining this level of activity for significant periods of time" (Tr. 113). At step five, based on Kerr's RFC and the testimony of Dr. Karen Nielsen, Ph. D., a vocational expert, the ALJ, using the Medical-Vocational Guidelines as a framework, *see* Appendix 2, Subpart P, Regulations No.

4, Rule 202.21, concluded Kerr was not disabled because she could perform a restricted range of light work, including jobs such as a final inspector, a final assembler and a sorter, all of which are jobs that exist in significant numbers in the regional and national economy, and that she was, therefore, not disabled within the meaning of the Act.

Kerr then asked for a review by the Appeals Council of the ALJ's adverse decision (Tr. 117-118). The Appeals Council will grant a request to review an ALJ's decision if any of the following circumstances are present: (1) it appears that the ALJ abused his discretion; (2) the ALJ made an error of law in reaching his conclusions; (3) substantial evidence does not support the ALJ's actions, findings, or conclusions; or (4) a broad policy issue may affect the public interest. 20 C.F.R. §§ 404.970, 416.1470 (2009). After considering Kerr's contentions, in light of the applicable regulations and evidence, the Appeals Council vacated the hearing decision under the authority of 20 C.F.R. §§ 404.977 and 404.1477 for resolution of the following issues: The decision did not include a discussion of either the claimant's diagnosis of fibromyalgia or her obesity and the decision did not consider medical opinions; prior work record; the location, duration frequency and intensity of pain or other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness and side effects of medication; treatment other than medication; and other measures used to relieve symptoms when weighing the credibility of the claimant's subjective complaints (Tr. 120).

The ALJ held a second hearing on February 27, 2007 (Tr. 20), and on March 9, 2007, the ALJ issued his decision again finding Kerr not disabled (Tr. 31). The ALJ found, at step one, that Kerr had not engaged in substantial gainful activity since the alleged onset of

disability. At step two he found that Kerr has chronic pain syndrome, obesity, hypertension, diabetes, bipolar disorder, borderline personality disorder, and posttraumatic stress disorder. At step three, he found that none of these impairments or combination of impairments meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, 416.926 (2009)). At step four, the ALJ concluded that Kerr had the RFC to "lift and or carry and push and or pull 20 pounds occasionally and 10 pounds frequently, stand and or walk about 6 hours in an 8-hour workday, and sit about 6 hours in an 8-hour workday. Furthermore, the claimant is limited to simple, routine work with one or two step instructions in a low stress environment, limited interaction with the public or co-workers, and avoidance of hazards such as heights, vibration, and dangerous machinery" (Tr. 23). Also, the ALJ found that Kerr could not return to her past relevant work. At step five, based on Kerr's RFC and the testimony of Herman Litt, a vocational expert, the ALJ, using the Medical-Vocational Guidelines as a framework, *see* Appendix 2, Subpart P, Regulations No. 4, Rule 202.21, concluded Kerr was not disabled because she could perform a restricted range of light work, including jobs such as an office cleaner, a laundry worker and a small products assembler, all of which are jobs that exist in significant numbers in the regional and national economy. Further, the ALJ found that even at the sedentary level of work activity, Kerr could perform such jobs as a surveillance monitor, an optical goods worker and an assembler of eye glasses, all of which are jobs that exist in significant numbers in the regional and national economy, and therefore Kerr was not disabled within the meaning of the Act.

Kerr then asked for a review by the Appeals Council of the ALJ's adverse decision (Tr. 15). The Appeals Council will grant a request to review an ALJ's decision if any of the following circumstances are present: (1) it appears that the ALJ abused his discretion; (2) the ALJ made an error of law in reaching his conclusions; (3) substantial evidence does not support the ALJ's actions, findings, or conclusions; or (4) a broad policy issue may affect the public interest 20 C.F.R. §§ 404.970, 416.1470 (2009). After considering Kerr's contentions, in light of the applicable regulations and evidence, the Appeals Council concluded, on February 13, 2008, that there was no basis upon which to grant Kerr's request for review (Tr. 6). The ALJ's findings and decision thus became final. Kerr has timely filed her appeal of the ALJ's decision. 42 U.S.C. § 405(g) (2009). Both Kerr and the Commissioner have filed Motions for Summary Judgment (Document Nos. 16 & 14). This appeal is now ripe for ruling.

## III. Standard for Review of Agency Decision

The court's review of a denial of disability benefits is limited "to determining (1) whether substantial evidence supports the Commissioner's decision, and (2) whether the Commissioner's decision comports with relevant legal standards." *Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999). Indeed, Title 42, Section 405(g) (2009) limits judicial review of the Commissioner's decision: "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." The Act specifically grants the district court the power to enter judgment, upon the pleadings, and transcript, "affirming,

modifying, or reversing the decision of the Commissioner of Social Security with or without remanding the case for a rehearing" when not supported by substantial evidence. 42 U.S.C. § 405(g) (2009). While it is incumbent upon the court to examine the record in its entirety to decide whether the decision is supportable, *Simmons v. Harris*, 602 F.2d 1233, 1236 (5th Cir. 1979), the court may not "reweigh the evidence in the record nor try the issues *de novo*, nor substitute its judgment" for that of the Commissioner even if the evidence preponderates against the Commissioner's decision. *Chaparro v. Bowen*, 815 F.2d 1008,1009 (5th Cir. 1987); *se also Jones v. Apfel*, 174 F.3d at 693; *Cook v. Heckler*, 750 F.2d 391 (5th Cir. 1985). Conflicts in the evidence are fore the Commissioner to resolve. *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992) (quoting *Hemphill v. Weinberger*, 483 F.2d 1127 (5th Cir. 1973)).

The United States Supreme Court has defined "substantial evidence" as used in the Act, to be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (quoting *Consolidated Edison Co. V. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence is "more than a scintilla and less than a preponderance." *Spellman v. Shalala*, 1 F.3d 357, 360 (5th Cir. 1993). The evidence must create more than "a suspicion of the existence of the fact to be established, but no 'substantial evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).

## IV. Burden of Proof

An individual claiming entitlement to disability insurance benefits under the Act has the burden of proving her disability. *Johnson v. Bowen*, 864 F.2d 340, 344 (5th Cir. 1988). The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A) (2009). The impairment must be proven through medically accepted clinical and laboratory diagnostic techniques. 42 U.S.C. § 423(d)(3) (2009). The impairment must be so severe as to limit the claimant in the following manner:

> [she] is not only unable to do [her] previous work but cannot, considering [her] age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [she] lives, or whether a specific job vacancy exists for [her], or whether [she] would be hired if [she] applied for work.

42 U.S.C. § 423(d)(2)(A) (2009). The mere presence of an impairment is not enough to establish that one is suffering from a disability. Rather, a claimant is disabled only if she is "incapable of engaging in any substantial gainful activity." *Anthony*, 954 F.2d at 293 (quoting *Milam v. Bowen*, 782 F.2d 1284 (5th Cir. 1986)).

The Commissioner applies a five-step sequential process to determine disability status:

1. If the claimant is presently working, a finding of "not disabled" must be made;

2. If the claimant does not have a "severe" impairment or combination of impairments, she will not be found disabled;

3. If the claimant has an impairment that meets or equals an impairment listed in

Appendix 1 of the Regulations, disability is presumed and benefits are awarded;

4. If the claimant is capable of performing past relevant work, a finding of "not disabled" must be made; and

5. If the claimant's impairment prevents her from doing any other substantial gainful activity, taking into consideration her age, education, past work experience, and residual function capacity, she will be found disabled.

*Anthony*, 954 F.2d at 293; *see also Leggett v. Chater*, 67 F.3d 558, 563 n.2 (5th Cir. 1995); *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir.1991). Under this formula, the claimant bears the burden of proof on the first four steps of the analysis to establish that a disability exists. If he is successful, the burden shifts to the Commissioner, at step five, to show that the claimant can perform other work. *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999). Once the Commissioner demonstrates that other jobs are available, the burden shifts, again, to the claimant to rebut this finding. *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990). If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends. *Leggett*, 67 F.3d at 563.

Here, the ALJ found that Kerr, despite her impairments and limitations, could perform a limited range of light work, limited to simple, routine work with one or two step instructions in a low stress environment, limited interaction with the public or co-workers, and avoidance of hazards such as heights, vibration, and dangerous machinery (Tr. 23). The ALJ further found that even though she could not perform her past relevant work as a teaching assistant, an assistant director of a clothing store and a retail china store assistant manager, she could, given her age (47 at the time of the hearing), education (high school),

work experience (manager, teachers aide), and relying on the testimony of a vocational expert and the Medical-Vocational Guidelines as a framework, perform other jobs such as a laundry worker, an office cleaner, a small products assembler, a surveillance monitor, an optical goods worker and an assembler of eye glasses, all of which exist in sufficient numbers, and therefore she was not disabled within the meaning of the Act. As a result, the Court must determine whether substantial evidence supports the ALJ's step five finding.

In determining whether substantial evidence supports the ALJ's decision, the court weighs four factors: (1) the objective medical facts; (2) the diagnosis and expert opinions of treating, examining and consultative physicians on subsidiary questions of fact; (3) subjective evidence as testified to by the plaintiff and corroborated by family and neighbors; and (4) the plaintiff's education background, work history, and present age. *Wren*, 925 F.2d at 126.

## V. Discussion

### A. Objective Medical Evidence

The objective medical evidence shows that Kerr has complained of and had been treated for diabetes mellitus, obesity, hypertension, bipolar disorder, borderline personality disorder and posttraumatic stress disorder.

The medical records show that on February 7, 1995, Kerr had an x-ray of her thoracic spine as well as her right shoulder. Dr. S. Patel came to the conclusion regarding the thoracic spine that there were mild degenerative changes, and regarding the right shoulder that there were no issues.

On November 21, 2000, Kerr was admitted to Cypress Creek Hospital for "suicide threats" (Tr. 208). While at the hospital, Georgia Gaiser, PA-C conducted a physical exam of Kerr and noted that the "[n]eck is supple without adenopathy or thyromegaly" and additionally noted that the "[b]ack exam is negative for tenderness." The impression of this exam was that there was "[s]ome chronic low back pain" and level III activity such as low impact aerobics, bench aerobics, swimming was recommended as tolerated (Tr. 212). In a psychiatric assessment created after Kerr was released on November 22, 2000, Dr. James Heald, M.D. listed Kerr's GAF scores as "30/40/55" although no chronology is established for them (Tr. 210).

On March 29, 2001, Kerr went to the York Plaza Medical Clinic where she was treated for low back pain with Motrin. The diagram on the examination page denotes pain in the neck and lower back region (Tr. 313).

On June 18, 2001, Kerr was admitted to the Conroe Medical Center complaining of chronic lumbar pain. While at Conroe Medical Center, an x-ray as well as an MRI of her cervical spine were taken, and both showed that the cervical spine was normal (Tr. 254-56).

The first record of Kerr being diagnosed with fibromyalgia comes from a visit to the York Plaza Medical Clinic on February 19, 2002. As a followup procedure, the examining doctor recommended exercise (Tr. 310).

On May 7, 2002 at 4:53 p.m., Kerr went to the Conroe Medical Center emergency room complaining of "back pain" (Tr. 244). During the physical exam that accompanied this visit to the emergency room, tenderness was noted in both the neck and the back, however,

while there, Kerr was seen stretching to pick paper off the floor without any signs of pain (Tr. 246). At 9:59 p.m., Kerr returned to the emergency room complaining of mid and upper back pain (Tr. 241). During the physical exam that accompanied this visit, there was no tenderness noted in either the neck or the back.

Kerr began going to UTMB Galveston October 18, 2002 (Tr. 288). On her November 25, 2002 visit, the physician noted trigger point pain, but failed to note which trigger points, or even how many, produced pain (Tr. 284).

On January 23, 2003, Kerr went to the emergency room at Huntsville Memorial Hospital complaining of back pain as well as a knot in her right shoulder. During this emergency room visit, tenderness was noted in the "mid thoracic area between scapulae." The physician noted that Kerr had "been out of meds for awhile." and the doctor's impression was that Kerr suffered from "chronic back pain / fibromyalgia with recent exacerbation"(Tr. 354).

On March 9, 2003, Kerr was admitted to the Huntsville Memorial Hospital emergency room after ingesting an unknown quantity of Klonopin and Robaxin. Kerr remained at Huntsville Memorial Hospital until March 12, 2003, and while there was treated for fibromyalgia, hypertension and diabetes mellitus. Her hypertension and diabetes were treated by restarting her medications, and her fibromyalgia was treated with pain medicine and muscle relaxers. According to the discharge summary, "the pain gradually improved" (Tr. 262). In a progress note from Kerr's stay, the physician or nurse wrote "Chronic fibromyalgia => trigger point (?) (R) mid humerus" (Tr. 263).

On April 30, 2003, doctors at UTMB Galveston performed an electrodiagnostic exam, but uncovered no abnormal results. Additionally, despite Kerr claiming that she had suffered from a knot in her right arm for the past three months, there was "no mass palpable on exam" (Tr. 277).

In connection with Kerr's application for SSI, Dr. Terry Collier completed an RFC assessment on June 30, 2003 from his review of Kerr's medical records. Dr. Collier opined that Kerr could occasionally lift 20 pounds, could frequently lift 10 pounds, could stand for about 6 hours in an 8 hour workday, could sit for about 6 hours in an 8 hour workday, and was unlimited in pushing and/or pulling. In explaining why he  came to these conclusions, Dr. Collier noted "some tenderness around thoracic area..." (Tr. 292).  In evaluating Kerr's symptoms, Dr. Collier noted that the allegations were "partially credible" (Tr. 296).

On July 25, 2003, Dr. Marciano Limsiaco, M.D. performed a psychiatric evaluation of Kerr. The results of Dr. Limsiaco's examination and his conclusions follow:

MENTAL STATUS EXAMINATION:

Shows an obese white female who appears about her stated age. Her grooming is good and she is dressed casually. She was tearful most of the times during the interview, but was cooperative and able to interact well. Her speech was normal in rate. Her affect was restricted. She described her mood as depressed. Her thought process is coherent. Currently, she denies any suicide or homicide ideation or plan. Currently, there is no hallucination or delusion noted. Her fund of information is fair. She knows Bush as president, but does not know the vice-president. Her memory as to recent and remote appears intact. She was able to remember significant events in the past. She was able to register three objects and recall two out of three objects after five minutes. There was no significant impairment in her concentration. She was able to spell WORLD backwards. She was able to do serial three subtractions and complete the task. She was oriented x3. She seems capable of abstract thinking as shown by her ability to interpret the proverbs. She has fair insight and judgment. Based on objective evidence, her depressive symptoms might interfere with her

ability to make personal, social, and occupational adjustments. She might have problems handling stress and interacting with other people.

IMPRESSIONS:

AXIS I: Major Depression, Recurrent as evidenced by the major depressive episodes which led to several psychiatric hospitalizations. The symptoms include feeling of hopelessness, sad mood, hyperphagia, insomnia, and suicide attempts.
          Dysthymic Disorder as evidenced by the presence of chronic depressive symptoms wherein in the past years there have been more days she has been depressed than not. She claimed the chronic depression started when she was in her teens.

AXIS II: Personality Disorder with Borderline Traits as evidenced by a pervasive pattern of unstable mood, inappropriate intense anger, and suicidal behaviors.

AXIS III:     Diabetes
              Fiber Myalgia
              Chronic Back Pain

GAF:          45

PROGNOSIS:

Guarded, because of the presence of an underlying personality disorder and poor response to psychiatric treatment.


(Tr. 300 - 01).


On August 11, 2003, Dr. Charles Lankford, PhD. completed a Psychiatric Review Technique form. In the form, he based his medical disposition on affective disorders and on personality disorders (Tr. 326). For affective disorders, Dr. Lankford found that "MDD, recurrent" and "dysthymic d/o" were present and medically determinable, although they didn't precisely satisfy the diagnostic criteria in the form (Tr. 329). For personality disorders, Dr. Lankford found that personality disorder with borderline traits was present and medically

determinable, although it didn't precisely satisfy the diagnostic criteria in the form (Tr. 333).

Dr. Lankford also noted that Kerr was "able to take care of her own personal needs, requires

no supervision; able to bathe, dress, and feed herself. Does laundry and cleans house.

Watches TV. Stays home most of the time" (Tr. 338). Dr. Lankford concluded that the

"symptoms alleged are not fully supported by MEOR" (Tr. 339).

On August 12, 2003 Kerr was admitted to the Huntsville Memorial Hospital

emergency room for fibromyalgia pain that made her feel as though she was about to faint

(Tr. 349). That same day, Kerr had spoken with Tri-County Mental Health Mental

Retardation (MHMR) Services complaining of anxiety, shaking and problems talking. The

Mental Status Exam does not show any abnormal behavior (Tr. 394). Kerr's GAF was 40,

and a GAF of 50 had been noted within the past year (Tr. 396).

On August 19, 2003, Kerr underwent an MRI scan of her right arm at Huntsville

Memorial Hospital. The MRI came back negative as to the cause of the pain Kerr complained

of (Tr. 348).

On December 2, 2003 another RFC assessment was completed, this time by Dr.

Randall Reid. Dr. Reid opined that Kerr could occasionally lift 20 pounds, could frequently

lift 10 pounds, could stand for about 6 hours in an 8 hour workday, could sit for about 6

hours in an 8 hour workday, and was unlimited in pushing and/or pulling (Tr. 315). Dr. Reid

concluded that the "claimant's alleged limitations are not fully supported by MEOR"(Tr.

319).

A Tri-County MHMR Services assessment on July 14, 2004, notes that Kerr was

admitted to the Huntsville Memorial Hospital emergency room for an overdose of Soma (Tr. 382). Her GAF was 20, with a GAF of 40 reported within the last year. From Huntsville Memorial Hospital, Kerr was taken to Rusk State Hospital for treatment. At the end of her stay on July 21, 2004, a Social Worker noted that Kerr was "appropriate in mood and behavior." Throughout her treatment, the hospital kept track of her pain and the subsequent reduction of that pain with treatment (Tr. 619). At the time of discharge, Kerr's GAF was 50 (Tr. 447).

Following her stay at Rusk State Hospital, Kerr followed up with Tri-County MHMR Services. Her GAF scores ranged from 50 on August 5 until July 28, down to 40 on August 22, 45 from October 17 until November 28, back down to 40 on December 21, topping out at 55 from January 24, 2006 until June 6, finally ending up at 40 again on the last recorded assessment which was on September 26, 2006 (Tr. 722 - 833).

Dr. John Norris, M.D. made a physical examination of Kerr on August 23, 2006, and noted that there were "no significant abnormalities" with her back (Tr. 695). In regards to Kerr's extremities, Dr. Norris noted that there was "diffuse muscle tenderness noted mostly in the upper arms. There are no real 'trigger points' noted" (Tr. 696). In conjunction with his physical examination, Dr. Norris submitted a Medical Source Statement of Ability to do Work-Related Activities (Physical). In it he noted that Kerr could occasionally lift 20 pounds, frequently lift less than 10 pounds, could stand or walk for less than 2 hours in an 8 hour workday, could sit without restriction, and was limited in pushing and/or pulling in both upper and lower extremities." Dr. Norris states that he relied on mostly subjective

information in these determinations, but also on the physical that he had performed. Dr. Norris also opined that Kerr should never climb, balance, kneel, crouch, crawl or stoop, had limited ability to constantly reach in all directions and was not to work near or with hazards. These determinations are described by Dr. Norris as being subjectively determined (Tr. 701-04).

Dr. John Vorhies testified at the February 27, 2007, hearing. Dr. Vorhies stated that in connection with his testimony, he reviewed Kerr's records. According to Dr. Vorhies, Kerr's primary medical complaint was chronic pain syndrome or fibromyalgia, but that this syndrome did not meet or equal a listing (Tr. 963). Dr. Vorhies stated that "the Social Security Administration likes to use the diagnostic criteria of having 11 out of 18 tender points. So the examiner specifically commented about the fact that he didn't find what he called real trigger points" (Tr. 964). As to Kerr's obesity, Dr. Vorhies stated that "the Claimant's been obese most of her life, in fact, in the past weighed more than she does now, if I understood the testimony correctly. And so I don't think obesity alone was a significant factor at all, no" (Tr. 965).

Dr. Glen Sternes also testified at the February 27, 2007 hearing. Dr. Sternes stated that "the potential categories here would be 12.04 for the mood disorder the depression, the bipolar...the traumatic experience, and that would be 12.06...[a]nd then we have the borderline personality disorder, which would be 12.08." When asked by the ALJ if "there are any listings that are either met or equaled?" Dr. Sternes answered "no, sir" (Tr. 982).

Here, substantial evidence supports the ALJ's finding that Kerr's fibromyalgia was

not medically determinable, and that Kerr's remaining impairments (obesity, hypertension, diabetes, bipolar disorder, borderline personality disorder, and posttraumatic stress disorder) were severe impairments at step two, and that such impairments at step three, individually or in combination, did not meet or equal a listed impairment. The ALJ's conclusion that Kerr could perform a restricted range of light work is supported by the objective medical evidence, and therefore  this factor weighs in favor of the ALJ's decision.

### B. Diagnosis and Expert Opinion

The second element considered is the diagnosis and expert opinions of treating and examining physicians on subsidiary questions of fact. Unless good cause is shown to the contrary,  the opinion, diagnosis, and medical evidence of the treating physician, especially when the consultation has been over a considerable amount of time, should be accorded considerable weight." *Perez v. Schweiker*, 653 F.2d 997, 1001 (5th Cir. 1981). For the ALJ to give deference to a medical opinion, however, the opinion must be more than conclusional and must be supported by clinical and laboratory findings. *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985); *Oldham v. Schweiker*, 660 F.2d 1078 (5th Cir. 1981). Indeed, "[a] treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with ... other substantial evidence.'" *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000) (quoting *Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir. 1995)). The opinion of a medical specialist is generally accorded more weight than opinions of non-specialists. *Id*. "'[T]he Commissioner is free to reject the opinion of any

physician when the evidence supports a contrary conclusion.'" *Martinez*, 64 F.3d at 176 (quoting *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1987)). Further, regardless of the opinions and diagnoses of medical sources, "the ALJ has sole responsibility for determining a claimant's disability status." *Martinez*, 64 F.3d at 176.

The Social Security Regulations provide a framework for the consideration of Medical opinions. Under 20 C.F.R. §§ 404.1527(d)(2)-(6), 416.927(d)(2)-(6), consideration of a physician's opinion must be based on:

(1)   the physician's length of treatment of the claimant,

(2)   the physician's frequency of examination,

(3)   the nature and extent of the treatment relationship,

(4)   the support of the physician's opinion afforded by the medical evidence of record,

(5)   the consistency of the opinion with the record as a whole, and

(6)   the specialization of the treating physician.

*Newton*, 209 F.3d at 456. While opinions of treating physicians need not be accorded controlling weight on the issue of disability, in most cases such opinion must at least be given considerable deference. *Id.* Again, the Social Security Regulations provide guidance on this point. Social Security Ruling 96-2p provides:

> [A] finding that a treating source medical opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all

of the factors provided in 20 C.F.R. 404.1527 and 416.927. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

Social Security Ruling (SSR) 96-2p, 61 Fed. Reg.34490 (July 2, 1996). With regard to the weight to be given "Residual Functional Capacity Assessments and Medical Source Statements," the Rule provides that "adjudicators must weigh medical source statements under the rules set out in 20 C.F.R. 404.1527 ...providing appropriate explanations for accepting or rejecting such opinion." *Id.*

The Fifth Circuit adheres to the view that before a medical opinion of a treating physician can be rejected, the ALJ must consider and weigh the six factors set forth in 20 C.F.R. 404.1527(d). *Newton*, 209 F.2d at 456. "The ALJ's decision must stand or fall with the reasons set forth in the ALJ's decision, as adopted by the Appeals Council." *Id.* At 455; *see also Cole v. Barnhart*, 288 F.3d 149, 151 (5th Cir. 2002) ("It is well-established that we may only affirm the Commissioner's decision on the grounds which he stated for doing so."). However, perfection in administrative proceedings is not required. *See Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988).

Here, the thoroughness of the ALJ's decision shows that he carefully considered the medical records and testimony, and that his determination reflects those findings accurately. The ALJ summarized the evidence and set forth specific reasons concerning the weight given to the opinions of the medical sources.

There are six medical opinions in the record: one from Dr. Terry Collier , an examining, non-treating physician who provided an RFC on June 30, 2003, one from Dr.

Charles Lankford, an examining non-treating consultant who provided a Psychiatric Review

Technique form on August 11, 2003, one from Dr. Randall Reid, an examining, non-treating

physician who provided an RFC on December 21, 2003, one from Dr. John Norris, an

examining, non-treating physician who provided a medical source statement of ability to do

work-related activities (physical) on August 23, 2006, one from Dr. John Vorhies, the

medical expert who testified at the administrative hearing based on his review of the medical

records, and finally one from Dr. Glen Sternes who testified at the administrative hearing

based on his review of the psychiatric records. There are no medical opinions in the records

from any of Kerr's treating physicians. None of the medical opinions submitted support the

conclusion that Kerr was disabled as a result of her alleged impairments. Rather, the

difference between the opinion offered by Dr. Norris and Drs. Vorhies, Reid and Collier

concerned Kerr's RFC. Specifically, Dr. Norris opined that Kerr could only perform work

at the sedentary level. In contrast, Dr. Reid and Dr. Collier opined that Kerr could perform

work at the light level. Dr. Vorhies testified that there was "no objective basis for

determining an RFC" (Tr. 967). The ALJ gave greater weight to the opinions of the State

agency medical consultants because their opinion was consistent with the record, and was

also consistent with the opinion of Dr. Vorhies. Even though four years had passed between

the diagnoses rendered by Dr. Collier and Dr. Reid and the administrative hearing, because

the objective evidence of record supports their opinions and because the testimony of Dr.

Vorhies supports their opinions, upon the record there was substantial evidence to support

the decision of the ALJ to give controlling weight to the medical opinions of Dr. Collier and

Dr. Reid. To the extent Kerr argues that the ALJ erred by not giving greater weight to Dr. Norris' opinion, the ALJ gave reasons supporting his determination. In regards to Kerr's impairments of bipolar disorder, borderline personality disorder, and posttraumatic stress disorder, the ALJ gave controlling weight to Dr. Glen Sternes rather than Dr. Lankford because Dr. Sternes' opinion is more consistent with the objective medical evidence of record. Given the ALJ's discussion of the objective medical evidence, and the ALJ's reliance on the opinion of Dr. Reid, Dr. Collier and Dr. Sternes, which opinions were found to be credible and consistent with the medical evidence as a whole, the Court concludes that the diagnosis and expert opinion factor also supports the ALJ's decision.

### C. Subjective Evidence of Pain

The next element to be weighed is the subjective evidence of pain, including the claimant's testimony and corroboration by family and friends. Not all pain is disabling, and the fact that a claimant cannot work without some pain or discomfort will not render her disabled. *Cook*, 750 F. 2d at 395. The proper standard for evaluating pain is codified in the Social Security Disability Benefits Reform Act of 1984, 42 U.S.C. § 423 (2009). The statute provides that allegations of pain do not constitute conclusive evidence of disability. There must be objective medical evidence showing the existence of a physical or mental impairment which could reasonably be expected to cause pain. Statements made by the individual or his physician as to the severity of the plaintiff's pain must be reasonably consistent with the objective medical evidence on the record. 42 U.S.C. § 423 (2009). "Pain constitutes a disabling condition under the SSA only when it is 'constant, unremitting, and

wholly unresponsive to therapeutic treatment.'" *Selders*, 914 F.2d at 618-19 (citing *Darrell v. Bowen*, 837 F. 2d 471, 480 (5th Cir. 1988)). Pain may also constitute a non-exertional impairment which can limit the range of jobs a claimant would otherwise be able to perform. *See Scott v. Shalala*, 30 F.3d 33, 35 (5th Cir. 1994). The Act requires this Court's findings to be deferential. The evaluation of evidence concerning subjective symptoms is a task particularly within the province of the ALJ, who has had the opportunity to observe the claimant. *Hames*, 707 F.2d at 166.

Here, Kerr testified about her condition. Kerr stated that her fibromyalgia bothers her mostly in her right arm, and "under the back" (Tr. 951). She also mentions that she has pain down her neck as well as headaches. As to the severity of the pain, she says that she "can't eat because [of] the pain..." (Tr. 952). She states that one of the times she tried to commit suicide, it was by taking all of her medicine so that the pain would stop (Tr. 943).

Based on the reasons which follow, the ALJ rejected Kerr's testimony as not entirely credible:

> 5. After careful consideration of the entire record, the undersigned United States Administrative Law Judge finds that the claimant has the residual functional capacity to lift and or carry and push and or pull 20 pounds occasionally and 10 pounds frequently, stand and or walk about 6 hours in an 8-hour workday, and sit about 6 hours in an 8-hour workday. Furthermore, the claimant is limited to simple, routine work with one or two step instructions in a low stress environment, limited interaction with the public or coworkers, and avoidance of hazards such as heights, vibration, and dangerous machinery.
>
> In making this finding, the undersigned United States Administrative Law Judge considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and 416.929 ans SSRs 96-4p and 96-7p. The undersigned United States Administrative Law Judge also considered opinion

evidence in accordance with the requirements of 20 CFR 404.1527 and 416.927 and SSRs 96-2p, 96-5p, 96-6p and 06-3p.

In considering the claimant's symptoms, the undersigned United States Administrative Law Judge must follow a two step process in which it must first be determined whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques--that could reasonably be expected to produce the claimant's pain or other symptoms.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, the undersigned United States Administrative Law Judge must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability to do basic work activities. For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the undersigned United States Administrative Law Judge must make a finding on the credibility of the statements based on a consideration of the entire case record.

Because a claimant's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone, 20 CFR 404.1529(c) and 416.929(c) describe the kinds of evidence, including the factors below, that the undersigned United States Administrative Law Judge must consider in addition to the objective medical evidence when assessing the credibility of the claimant's statements:

1. The claimant's daily activities;

2. The location, duration, frequency, and intensity of the claimant's pain or other symptoms;
3. Factors that precipitate and aggravate the symptoms;

4. The type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms;

6. Any measures other than treatment the claimant uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7. Any other factors concerning the claimant's functional limitations and restrictions

due to pain or other symptoms (SSR 96-7p).

The claimant testified that her major medical problem that prevents her from working is a bipolar disorder. She stated that she does not know when it will hit and that she was hospitalized at Rusk State hospital secondary to an overdose. The claimant indicated that she is very nervous and has been tried on multiple medications. She also indicated that she had diabetes, high blood pressure, fibromyalgia, and post-traumatic stress disorder. The claimant stated that she also has headaches daily, knots all over her body that hurt, a torn right rotator cuff, mental turmoil. She indicated that she attempted suicide on three occasions. The claimant also indicated that she is in pain, has memory loss, no friends, and that she barely sees her family. She stated that she is also afraid to leave her house unless someone is with her. The claimant indicated that she has difficulty being in crowds, cannot concentrate to read, and does not remember well. However, in her activities of daily living, the claimant testified that she has a driver's license and drives an automobile. She indicated that she has no side-effects from taking her medications. The claimant stated that she takes out the trash, buys groceries, travels alone, watches television, and receives visitors. She indicated that she can bend, lift 10 pounds, sit 2 hours, walk 1 block, and that she is unable to stand.

The claimant's husband testified and corroborated her testimony and further testified that the claimant has difficulty handling day to day activities. He stated that the claimant's previous divorce triggered a very stressful situation for her and that she was thrown into trauma. The claimant's husband indicated that the claimant has problems concentrating, she worries continuously, and she stays secluded except for being around her husband and daughter. He indicated that the claimant can bathe and care for her personal hygiene without assistance and that sometimes she watches her grandbaby. These statements appear credible but do not in and of themselves constitute evidence to support a claim of total disability.

The medical expert, Dr. Vorhies, testified that based on his review of the objective medical evidence of record as it relates to the claimant's physical condition, the claimant has a chronic pain syndrome but a MRI of her cervical spine was normal (Exhibit 4F, page 38). He indicated that the claimant has also had documented complaints of chest pain but she had a normal cardiac catheterization in 2002 (Exhibit 4F, pages 8-14).

The medical expert stated that the claimant underwent a consultative examination at which time the principle finding was that of obesity with the claimant's height at 63 inches and weight at 215 pounds. He noted that the claimant's blood pressure was normal. Dr. Vorhies indicated that the examiner commented that there was some tenderness on palpation of the arms but no real trigger points noted. He also noted that musculoskeletal examination was normal and the claimant was neurologically intact (Exhibit 18F). Dr. Vorhies stated that although the claimant alleges that she

engages in no physical activity, it is not because she is incapable but rather it is secondary to her complaints of pain and fatigue. The expert witness indicated that the claimant's impairments, singly or in combination, do not meet or equal the criteria for any impairment found in Appendix 1 to Subpart P of Regulations No. 4 (Listing of Impairments).

Dr. Vorhies indicated that the claimant does not meet the criteria for fibromyalgia for Social Security purposes because on examination, the examiner found no real trigger points. According to the American College of Rheumatology, to meet the diagnostic criteria for a diagnosis of fibromyalgia, an individual must have widespread pain in all four quadrants of their body for a minimum duration of three months and at least 11 of the 18 specified tender points. These 18 sites used for the diagnosis cluster around the neck, shoulder, chest, hip, knee, and elbow regions. Arthritis and Rheumatism Journal, copyright 1990. There is no documentation that the claimant has had at least 11 of the 18 specified tender points required for the diagnosis of fibromyalgia. The claimant alleged having pain in her neck, shoulder, arm, and back. However, there is no objective medical evidence of record or physical findings that refer to trigger points. Therefore, the undersigned United States Administrative Law Judge concludes that the claimant's diagnosis of fibromyalgia is medically non-determinable.

The medical expert further testified that the claimant has been obese most of her life and that obesity alone is not a significant factor. He stated that the claimant can stand up, walk, and carry around 200 pounds of excess weight indicating that her muscles, back, and central core muscles are strong. Despite her obesity, she has no need for assistive devices. Dr. Vorhies indicated that he has no real objective basis for determining what the claimant's residual functional capacity is, since there are only subjective complaints of pain and fatigue. With regard to any side-effects from medications, Dr. Vorhies stated that every medication is prescribed for some benefit and if it caused some adverse side-effects, they would be changed. Therefore, side-effects from medications are not a significant factor since medications can be changed and or adjusted. The opinion of the medical expert is credible and consistent with the objective medical evidence of record.

The undersigned United States Administrative Law Judge recognizes that two State agency medical consultants opined that the claimant retains the physical residual functional capacity to lift and or carry and push and or pull 20 pounds occasionally and 1- pounds frequently, stand and or walk about 6 hours in an 8-hour workday, and sit about 6 hours in an 8-hour workday (Exhibits 8F and 11F). The claimant's pain, fatigue, and obesity have been considered in these opinions. These opinions are credible and consistent with the objective medical evidence of record when considered in its entirety.

The medical expert, Dr. Sternes, testified that based on his review of the objective

medical evidence of record as it relates to the claimant's mental condition, the claimant has had a number of hospital stays and has been diagnosed as being depressed and then with a bipolar disorder. He stated that the claimant also has a diagnosis of borderline personality disorder on Axis II. Dr. Sternes indicated that some of the claimant's hospitalizations were for having a depressive disorder and showed the claimant's functioning with GAF of 20 but upon release 40 to 50 and more recently 55. He indicated that the claimant had 2 hospitalizations at Rusk State hospital as well as emergency detentions for threats of hurting herself or others (Exhibit 17F, page 7). The medical expert stated that all of the claimant's hospitalizations were for 1 week or less (Exhibits 2F, 14F, 16F, and 17F).

Dr. Sternes indicated that more recently it appears that the claimant is doing better while taking her medications. He stated that she has bipolar, depression, and has anxiety coming in, which was there but sub-clinical. Dr. Sternes also stated that the claimant has had some traumatic episodes with some traumatic recollections so she was diagnosed with post-traumatic stress disorder as of June 2004 (Exhibit 20F, page 42). The expert witness indicated that he considered the claimant's bipolar disorder under section 12.04, which meets the (A) criteria for having a bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive symptoms and currently characterized by either or both syndromes. He considered the claimant's post-traumatic stress disorder under section 12.06, which meets the (A) criteria under that section for having recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress.

Dr. Sternes considered the claimant's borderline personality disorder under section 12.08; however, he indicated that it does not precisely satisfy the diagnostic criteria for that section. He also made mention that the claimant had two positive drug screens for benzodiazepines and opiates, which are prescription medications. However, he indicated that it is unknown whether she had been abusing drugs or if those positive results are related to her medications as prescribed. Therefore, he did not consider section 12.09 since there is no objective evidence that the claimant has abused drugs and or alcohol during the relevant period under consideration.

With regard to the (B) criteria, Dr. Sternes opined that the claimant's mental impairments have resulted in moderate difficulties in restriction of activities of daily living, in difficulties in maintaining social functioning, and in difficulties in maintaining concentration, persistence or pace with no episodes of decompensation during the relevant period under consideration. Dr. Sternes reiterated that the claimant's hospitalizations were for 1 week or less and under Social Security standards an individual would have to be hospitalized for at least 2 weeks for it to be considered an episode of decompensation. He indicated that the evidence does not establish the presence of the (C) criteria. Dr. Sternes further opined that as a result of the claimant's mental impairments, she is limited to simple, routine work with one

or two step instructions in a low stress environment, limited interaction with the public or co-workers, and avoidance of hazards such as heights, vibration, and dangerous machinery. The opinion of Dr. Sternes is credible and consistent with the objective medical evidence of record.

Thus, the undersigned United States Administrative Law Judge has complied with the Order of the Appeals Council and has determined the nature and severity of the claimant's fibromyalgia and obesity. Further, claimant's counsel indicated that the record is complete and there was no additional and or updated evidence concerning the claimant's fibromyalgia. The undersigned United States Administrative Law Judge has also complied and evaluated the effects of the claimant's obesity upon her ability to perform work-related activities and in doing so has relied upon the testimony of the medical experts.

Another issue raised by the Appeals Council involves the claimant's subjective complaints and, after considering the evidence of record, the undersigned United States Administrative Law Judge finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible.

Although the claimant alleges being totally disabled there is no objective medical evidence of record to support this. The evidence shows that despite the claimant's allegations that her physical functional capabilities are significantly eroded, the objective findings and clinical signs establishes that she is neurologically intact and musculoskeletal examination was normal, even with her obesity at 215 pounds with a height of 63 inches (Exhibit 18F, page 2). The evidence clearly establishes that the claimant's diabetes is under control (Exhibit 5F, page 1 and exhibit 18F, page 3). Likewise, the evidence clearly establishes that her hypertension is well controlled (Exhibit 18F, page 2). With regard to the claimant's right arm complaints the evidence shows that there is some diffuse muscle tenderness but no edema or joint effusions and range of motion is normal (Exhibit 18F, pages 2 and 3).

With regard to the claimant's alleged mental limitations, she has some limitations but not to the degree as alleged. With regard to her activities of daily living, the claimant drives sometimes, goes to buy groceries, travels alone, and has visitors. In her social functioning, she has no significant problems relating to her husband or her daughter. Regarding her concentration, persistence and pace, she watches television and testified that she watches television and drives an automobile, both of which requires some level of concentration.

The undersigned United States Administrative Lw Judge has also considered the claimant's activities of daily living, which are inconsistent with that of a disabled

person. The claimant drives an automobile, goes to buy groceries, travels alone, watches television, and receives visitors. She also indicated that she can bend over, lift 10 pounds, sit 2 hours, and walk 1 block. These activities and functional abilities are consistent with an individual who can perform at the light level of work activity as defined by the Commissioner (20 CFR 404.1576(b) and 416.967(b)). The undersigned United States Administrative Law Judge also agrees with the testimony of Dr. Vorhies wherein he indicated that the claimant's ability to stand up, walk, and carry 100 pounds of excess weight, meaning her obesity, indicates that her muscles, back, and central core muscles are strong. She does not require assistive device. The undersigned United States Administrative Law Judge has also considered the claimant's medications (Exhibit 22F), which have no significant impact on the claimant's physical and mental functional abilities.

As for the opinion evidence, the undersigned United States Administrative Law Judge agrees with and gives controlling weight to the opinions of the State agency medical consultants as they relate to the claimant's physical limitations (Exhibits 8F and 11F) because these opinions are consistent with the testimony of Dr. Vorhies, the objective evidence of record, and takes into account the claimant's subjective complaints of pain and fatigue. Her obesity has also been considered in these opinions.

Further, the undersigned United States Administrative Law Judge has considered the opinion of the examining physician, Dr. Norris (Exhibit 8F, pages 8-11). However, the undersigned United States Administrative Law Judge gives little weight to this opinion as it is solely based on the claimant's subjective complaints, which the undersigned United States Administrative Law Judge must consider along with the objective findings and clinical signs. The undersigned United States Administrative Law Judge has also considered the opinions of the State agency medical consultants as they relate to the claimant's mental limitations (Exhibits 12F and 13F). The undersigned United States Administrative Law Judge gives some weight to these opinions; however, controlling weight is given to the medical expert, Dr. Sternes, because his opinion is more consistent with the objective medical evidence of record.

The undersigned finds that there is nothing in the record to suggest that the ALJ made improper credibility findings, or that he weighed the testimony improperly. Based on this record, there are significant inconsistencies between Kerr's subjective complaints and the objective medical evidence. The ALJ identified the inconsistencies and gave specific reasons for rejecting Kerr's subjective complaints, such as the lack of medical evidence to support

her subjective symptoms. Accordingly, this factor also supports the ALJ's decision.

### D. Education, Work History, and Age

The final element to be weighed is the claimant's educational background, work history and present age. A claimant will be determined to be under disability only if the claimant's physical or mental impairments are of such severity that she is not only unable to do her previous work, but cannot, considering her age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. § 423(d)(2)(A).

The record shows that Kerr, at the time of the second hearing, was forty-seven years old, and had completed high school. The ALJ questioned Herman Litt, a vocational expert ("VE"), at the hearing about Kerr's ability to engage in gainful work activities. "A vocational expert is called to testify because of his familiarity with job requirements and working conditions. 'The value of a vocational expert is that he is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed.'" *Vaughan v. Shalala*, 58 F.3d 129, 131 (5th Cir. 1995) (quoting *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986)). It is well settled that a vocational expert's testimony, based on a properly phrased hypothetical question, constitutes substantial evidence. *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994). A hypothetical question is sufficient when it incorporates the impairments which the ALJ has recognized to be supported by the whole record. Beyond the hypothetical question posed by the ALJ, the ALJ must give the claimant the "opportunity to correct deficiencies in the ALJ's hypothetical

questions (including additional disabilities not recognized by the ALJ's findings and disabilities recognized but omitted from the question)." *Bowling*, 36 F.3d at 436.

The ALJ posed the following hypothetical questions to the VE:

ALJ. Okay. Let me give you a hypothetical question. If a hypothetical Claimant of this Claimant's age, this Claimant's education, and this Claimant's past relevant work, and let me put that question to you at the light exertional level. And at the light exertional level -- Dr. Sternes, let me ask you, since you just testified, since Dr. Vorhies, did not see any limitations, as I recall, do you recommend or suggest any limitations to the light exertional level, such as low stress environment, supervised environment, simple, routine work, limit interaction with public or co-workers, things of that nature or anything else that you might suggest?

ME. Well, I think the limited stress would be appropriate. I don't know about any kind of supervisory restrictions or special [inaudible]. I think it would be easier for her to deal with simple, repetitive work, Your Honor.

ALJ. Okay. So simple, repetitive work. Are we talking about one, and two-step instruction type things?

Me. I think so.

ALJ. All right. And a low stress environment. Is that the - -

ME. We also talked about contact with the public. I think this would probably be best in the beginning. She might be able to handle it, but at a slow amount, but nothing where she's, you know, faced with a lot of the public.

ALJ. Okay. So limited interaction with the public or co-workers.

ME. Yes.

BY ADMINISTRATIVE LAW JUDGE:

Q. All right. So those three restrictions in mind, and I'm going to place another one that it would be avoidance of hazards, such as heights, vibrations, and dangerous machinery operation. All right, with those restrictions in mind, Mr.

Litt, do we have any jobs that our hypothetical Claimant could perform?

A. Yes, sir.

Q. Okay. Could you give me an indication of what they are?

A. Yes, sir. There would be jobs such as office cleaner.

Q. Okay.

A. And we have approximately 1,300 in the region, and 250,000 nationally.

CLMT: Excuse me. I can't clean my own house.

VE. Laundry worker.

BY ADMINISTRATIVE LAW JUDGE:

Q. Okay

A. Approximately 900 in the region and 200,000 nationally. And small products assembler, approximately 1,100 in the region, and 204,000 nationally. These are all light, unskilled jobs, Your Honor. Should meet with the hypothetical.

Q. Okay. And your testimony does not conflict with either The Dictionary of Occupational Titles or The Selected Characteristics of Occupations.

A. No, sir

The record further shows that Kerr's attorney was given the opportunity to question the VE:

Q. Okay. Now leaving at this point, the mental limitations exactly as they were in the Judge's hypothetical, we're going to change the physical limitation to what's identified there at 18F.

A. Uh-huh.

Q. Would that affect your answer to the first hypothetical?

A. Yes.

Q. In what way?

A. It appears that the standing or walking of less than two hours in a day would bring one then to the sedentary level, just in those terms, although he indicates that she could lift in the light level category.

Q. Those jobs you identified, she wouldn't be able to perform with those limitations.

A. That's correct.

Q. Okay. Now we're going to change the mental limitations. And those are going to include a poor ability to handle the stress, and poor ability to sustain concentration, persistence, and pace, keep it at the simple, repetitive instructions, and also poor ability to demonstrate reliability, such that the individual would be having to leave the workstation numerous times throughout the day. Is there any work they could perform under those circumstances?

A. No.

Q. If the individual was missing one day or more per week for psychiatric reasons or pain related symptoms, would that be consistent with any sustained employment if that was done on an ongoing basis?

A. They would not be able to maintain employment under those circumstances.

After Kerr's attorney questioned the VE, the ALJ submitted a final hypothetical to the VE:

Q. I'm going to ask you a question. Let's have all the same restrictions as in hypothetical one, except reduce it to the sedentary level. Do we have any jobs in that category that our hypothetical Claimant can perform?

A. Yes, sir.

Q. What might those be?

A. There would be jobs such as surveillance monitor.

Q. Okay.

A. At approximately 800 in the region, 140,000 nationally.

Q. Okay.

A. Optical good worker, have approximately 600 in the region, 135,000 nationally, and assembler, have approximately 900 in the region, and 185,000 nationally. Those are all sedentary, unskilled jobs.

Here, the ALJ relied on a comprehensive hypothetical question to the vocational expert. A hypothetical question is sufficient when it incorporates the impairments which the ALJ has recognized to be supported by the whole record. Upon this record, there is an accurate and logical bridge from the evidence to the ALJ's conclusion that Kerr was not disabled. Based on the testimony of the VE and the medical records, substantial evidence supports the ALJ's finding that Kerr could perform a limited range of light work.

Kerr argues that two of the three jobs identified in the first hypothetical are actually suited to a higher exertion level than suggested by Kerr's RFC. Because the ALJ submitted a second hypothetical with a reduced exertion level, any error in the first hypothetical is rendered harmless.

Because the hypothetical questions contained all the functional limitations recognized by the ALJ, the Court concludes that the ALJ's reliance on the vocational testimony was proper, and that the vocational expert's testimony, along with the medical evidence, constitutes substantial evidence to support the ALJ's conclusion that Kerr was not disabled within the meaning of the Act and therefore was not entitled to benefits. Further, it is clear from the record that the proper legal standards were used to evaluate the evidence presented.

Accordingly, this factor also weighs in favor of the ALJ's decision.

## VI. Conclusion

Considering the record as a whole, the Court is of the opinion that the ALJ and the Commissioner properly used the guidelines propounded by the Social Security Administration, which direct a finding that Kerr was not disabled within the meaning of the Act, that substantial evidence supports the ALJ's decision, and that the Commissioner's decision should be affirmed. As such, it is

ORDERED Plaintiff's motion for Summary Judgment (Document No. 16), is DENIED, Defendant's Motion for Summary Judgment (Document No. 14) is GRANTED, and the decision of the Commissioner of Social Security is AFFIRMED.

Signed at Houston, Texas, this ____ day of _____, 2009

_____
FRANCES H. STACY
UNITED STATES MAGISTRATE JUDGE